# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RONALD W. HARSHMAN,** | : | **CIVIL ACTION NO. 3:17-CV-116** |
| | : | |
| **Petitioner** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **SUPERINTENDENT, STATE** | : | |
| **CORRECTIONAL INSTITUTION** | : | |
| **AT ROCKVIEW,** *et al.,* | : | |
| | : | |
| **Respondents** | : | |

## MEMORANDUM

Petitioner Ronald W. Harshman ("Harshman") is serving a sentence of life imprisonment without parole for first-degree murder. He filed an application for a writ of habeas corpus under 28 U.S.C. § 2254, seeking relief from his Pennsylvania murder conviction. Magistrate Judge Karoline Mehalchick recommends that the court grant Harshman's Section 2254 petition. We agree with Judge Mehalchick's recommendation and will grant the writ.

## I.   **Background**[1]

In 1984, Harshman's wife, Teresa Harshman ("Teresa"), began an affair with Melvin Snyder ("Snyder"), a married man who worked with Harshman. (Doc. 1 ¶ 2). Teresa and Snyder decided to leave their spouses and move to Montana

---

[1] The factual background is taken largely from the undisputed averments in Harshman's Section 2254 petition to the extent they find support in the state-court record created in this case, as well as from the state-court record itself. When respondents dispute an averment or when additional facts are necessary, we rely on the state-court factual findings unless they are rebutted "by clear and convincing evidence." See 28 U.S.C. § 2254(e)(1).

together, and on June 7, 1984, Teresa informed Harshman of her intentions. (Id.) Harshman reacted badly to this news and drove toward Snyder's home, at which point Harshman encountered Snyder en route to pick up Teresa. Commonwealth v. Harshman, No. CP-28-CR-851-2000, at 1 (Pa. Ct. Com. Pl. Franklin Cty. Aug. 20, 2015) [hereinafter "8/20/15 PCRA[2] Op."]. Harshman crashed his vehicle into Snyder's and fired two shots from a handgun into the seat beside Snyder. Id. at 1. Snyder was unhurt but obviously quite distressed by the confrontation. Id. Harshman was charged with reckless endangerment, but Snyder convinced the state to withdraw the charges. (Doc. 1 ¶ 3).

Teresa and Snyder traveled to Montana together as planned, but returned to their respective residences and marriages a few weeks later. (Id. ¶ 4). Snyder and his wife reconciled; Harshman and Teresa did not. (Id.) Teresa left Harshman and filed for divorce in March 1985. (Id.) Three days after Teresa served Harshman with divorce papers, he purchased a .25 caliber handgun. (7/11/01 Trial Tr. 8:2-15, 9:1-5). Harshman made various threats against Snyder to Snyder's wife and son throughout 1984 and into 1985. Commonwealth v. Harshman, No. 1620 MDA 2015, 2016 WL 3135797, at *1 (Pa. Super. Ct. June 3, 2016) (nonprecedential).

On May 25, 1985, approximately one year after Teresa and Snyder began their affair, Snyder disappeared. (Doc. 1 ¶ 5). Snyder's pickup truck was found two days later in Maryland with a loaded rifle in the back, keys in the ignition, and the

---

[2] "PCRA" stands for the Post Conviction Relief Act, 42 PA. CONS. STAT. § 9541 et seq., Pennsylvania's corollary to federal habeas corpus relief.

windows rolled down.  (Id.)  His wallet and checkbook were also recovered from the

vehicle, which had been wiped clean of fingerprints.  Harshman, 2016 WL 3135797,

at *2.  A search of Snyder's barn revealed signs of a disturbance.  Id.  A single .25

caliber shell casing discovered in the barn was turned over to the Pennsylvania

State Police because Snyder did not own a .25 caliber gun.  Id.  Neighbors testified

that, on the day Snyder went missing, they saw a two-tone brown truck parked next

to the barn.  Id.  They then saw the same truck, which Harshman had purchased in

1984, parked at Harshman's residence.  Id.  In June 1985, police searched

Harshman's home, finding an empty gun box and a partially empty container of .25

caliber ammunition.  Id.  When police asked Harshman to produce the gun, he told

them that Teresa had it, but Teresa denied that assertion.  Id.

Snyder was never seen or heard from again, and in 1993 was officially

declared dead.  (Doc. 1 ¶ 6).  No body has ever been discovered.  (Id.)  In the

summer of 1999, the Franklin County District Attorney enlisted assistance to search

the farm where Harshman and Teresa lived at the time of Snyder's disappearance.[3]

(Id. ¶ 7).  Investigators, using metal detectors, found a single .25 caliber shell casing

buried one inch below ground on the property.  (Id.)  A ballistics expert determined

that the shell casing was fired from the same gun as the shell casing recovered from

Snyder's barn in 1985.  Harshman, 2016 WL 3135797, at *2.

---

[3] The 2010, 2014, and 2015 PCRA court opinions state that the search was
conducted in 1994.  This date appears to be erroneous as the trial testimony and
other record evidence clearly establish that the search occurred in 1999.  See
Harshman, 2016 WL 3135797, at *2; (7/11/01 Trial Tr. 152:15-23; Doc. 1 ¶ 7).

Harshman and Snyder's wife were arrested and charged with Snyder's murder in April 2000. Id. The charges against Snyder's wife were eventually withdrawn. Id. On July 9, 2001, Harshman began a five-day jury trial for first-degree murder. (Doc. 1 ¶ 9). Of particular importance for the instant petition, besides the above-referenced evidence, the jury heard testimony from three jailhouse informants who had been incarcerated with Harshman at the Franklin County Jail in 2000. (Id. ¶¶ 10, 88).

Randi Kohr ("Kohr") testified that while playing cards with Harshman and two other inmates, Harshman admitted that he "was with a woman and she cheated on him. He caught them and he ended up shooting him and he got rid of the body." (7/12/01 Trial Tr. 20:5-22, 21:10-13). Kohr further testified that Harshman had stated that "there would be no evidence. There's no gun, no body, no casings . . . . There's no evidence against me." (Id. at 29:11-15). Keith Granlun ("Granlun"), a former minister incarcerated for drunk driving and unsworn falsification to authorities, attested that Harshman had admitted that he had "murdered somebody years ago" and "wanted to know if he could be saved for that." (Id. at 40:24-41:18; Doc. 1 ¶ 15). Granlun testified that Harshman asked Granlun to go to Maryland and pray over a particular area where "somebody is buried." (7/12/01 Trial Tr. 42:10-23). Finally, Wallace Jones ("Jones") testified that he was known in jail for proficiency with legal research, and that Harshman had asked him if he could "find anything where it was known in Pennsylvania for someone to be tried for a homicide without a body ever actually being found." (Id. at 33:12-21). According to Jones, Harshman maintained that in his case, "there's no body or a gun and they won't find one." (Id. at 34:11-12).

All three jailhouse witnesses averred that they were not testifying pursuant to any deal with, or in exchange for any personal favorable treatment from, the Commonwealth.  (Id. at 21:14-21, 28:9-14, 29:21-30:9 (Kohr); 38:16-24 (Jones); 49:12-50:12 (Granlun)).  Then-District Attorney for Franklin County, the late John F. Nelson, Esquire ("DA Nelson"), emphasized in his closing that "no deals" were made with the jailhouse informants, claimed that nothing was "offered" by the Commonwealth in exchange for testimony, and reviewed each witness's allegedly selfless motives for testifying.  (7/13/01 Trial Tr. at 62:21-64:4).  After deliberating for less than four hours, the jury convicted Harshman of first-degree murder.  (Doc. 1 ¶ 17; 7/13/01 Trial Tr. 96:1-2, 104:7-8, 18-22).  Harshman was sentenced the same day to a mandatory term of life in prison without parole.  (Doc. 1 ¶ 17).

## II.     Procedural History

Harshman's state-court procedural history is both lengthy and circuitous. After his direct appeal was denied, he began his pursuit of post-conviction relief, which has been ongoing for nearly 15 years.  (See Doc. 1 ¶¶ 18-21).  Harshman timely filed a *pro se* PCRA petition in December 2004, which was amended in June 2006 by retained counsel.  (Id. ¶ 21).  Because of the complicated procedural course of Harshman's post-conviction process, we separately discuss the relevant portions of each PCRA opinion and appeal.

### A.     September 2010 PCRA Opinion and Appeal

In his amended PCRA petition, Harshman averred, *inter alia*, that the jailhouse informants wanted to disavow their prior trial testimony.  Commonwealth v. Harshman, No. CP-28-CR-851-2000, at 4 (Pa. Ct. Com. Pl. Franklin Cty. Sept. 13,

2010) [hereinafter "9/13/10 PCRA Op."]. Harshman contended that Granlun had spoken with a private investigator and had fully recanted and admitted that his trial testimony was false. (Doc. 9-10 at 43). Granlun, moreover, was prepared to testify to this effect at the PCRA evidentiary hearing. (Id.) According to Harshman, Kohr, too, had recanted his trial testimony in a signed, written statement witnessed by Harshman's PCRA counsel. (Id. at 48). This statement allegedly contained Kohr's admission that he had never spoken to Harshman in his life and had obtained details for his trial testimony from newspaper articles and conversations with other inmates. (Id.) Kohr's statement went on to claim that "[t]he testimony I provided was absolutely false and the only reason I gave false testimony was because the District Attorney had agreed to help me obtain an early release from prison." (Id. at 49 (quoting Harshman PCRA Ex. 1)). Kohr had also purportedly mailed letters to Harshman's PCRA counsel and Kohr's then-girlfriend, Megin Chilcote ("Chilcote"), outlining an agreement with the prosecution to provide testimony against Harshman in exchange for favorable treatment. (Id. at 49-53).

The PCRA court held evidentiary hearings on August 3, 2009, September 10, 2009, and December 14, 2009. At the August 3 hearing, Harshman presented the testimony of Walter Dill ("Dill"), Granlun's brother-in-law of 27 years. 9/13/10 PCRA Op. at 3; (8/3/09 PCRA Hr'g Tr. 25:14-21). According to counsel's proffer, Dill would testify that Granlun had directed him to contact Harshman's trial counsel, Attorney David S. Keller ("Attorney Keller"), because false testimony was going to be given at Harshman's upcoming trial. (8/3/09 PCRA Hr'g Tr. 20:5-12, 21:11-20, 22:6-10). The PCRA court, on the Commonwealth's objection, limited Dill's

testimony to the fact that Granlun had told Dill to contact Attorney Keller regarding the upcoming murder trial and that Dill did as asked. (Id. at 26:7-27:2; 28:3-11). The court determined that what Granlun specifically told Dill regarding why Dill should contact Attorney Keller was more appropriate for direct testimony from Granlun. (Id. at 22:12-23:7, 27:4-11).

That testimony never came because Granlun—upon advice from appointed counsel—asserted his Fifth Amendment privilege against self-incrimination. (Id. at 56:1-60:25). Granlun explained that, according to his counsel, police were "waiting to arrest him" and he "would be arrested" if he provided testimony contradicting his prior trial testimony. (Id. at 56:6-11, 21-23; 59:5-24). Granlun steadfastly refused to testify unless granted immunity from prosecution for perjury. (Id. at 56:25-57:19). DA Nelson confirmed Granlun's predicament, stating that "it wasn't a threat" but rather "a fact of life" that Granlun would be arrested for perjury if he contradicted his prior testimony. (Id. at 63:12-23, 64:1-7). Kohr likewise blanketly invoked the Fifth Amendment and refused to testify. (Id. at 37:4-20).

At the September 10, 2009 evidentiary hearing, only Chilcote testified.[4] 9/13/10 PCRA Op. at 4. Chilcote attested that she had spoken with DA Nelson and detective Mark Christman ("Detective Christman") on multiple occasions and that DA Nelson told her "if [Kohr] would testify in the Harshman case that [DA Nelson]

---

[4] At the time of her September 2009 PCRA testimony, Chilcote had married Kohr, taken his last name, and then divorced him. (9/10/09 PCRA Hr'g Tr. 7:20-22; 11:3-12:6). When she again testified at a May 21, 2015 hearing, Chilcote's last name had been changed from "Kohr" to "Feagley." (5/21/15 PCRA Hr'g Tr. 4:25-5:1).

would release [Kohr]" from prison. (9/10/09 PCRA Hr'g Tr. 13:3-16:4; 29:18-19; 30:13-18). Chilcote averred that she had called multiple times a week to urge the prosecutor to "keep up his end of the bargain," so much so that "[DA] Nelson got tired of [her] calling, so he started making [her] talk to [Detective Christman] at that point in time." (<u>Id.</u> at 15:25-17:2).

At the December 14, 2009 evidentiary hearing, the Commonwealth called Detective Christman to testify. 9/13/10 PCRA Op. at 5. When asked whether he was aware of "any agreement that the Commonwealth made with Kohr in order to secure his testimony at trial," Detective Christman replied that he was aware only that DA Nelson had written letters to the Pennsylvania Board of Probation and Parole on Kohr's behalf seeking to have Kohr's parole "reconsidered." (12/14/09 PCRA Hr'g Tr. 5:2-12). Two letters written by DA Nelson to the parole board, dated November 28, 2000, and January 19, 2001, were then admitted into evidence. (<u>Id.</u> at 5:16-6:22; <u>see</u> <u>also</u> Docs. 1-5, 1-6). According to the PCRA court, the letters "ask the Board to take [Kohr's] cooperation into consideration and 'perhaps grant him an earlier release date.'" 9/13/10 PCRA Op. at 5 (quoting Commonwealth Ex. 1).

In its initial post-conviction decision, the PCRA court identified three grounds for relief raised by Harshman: (1) ineffective assistance of trial counsel; (2) violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), for failing to disclose exculpatory evidence; and (3) an after-discovered evidence claim pursuant to 42 PA. CONS. STAT. § 9543(a)(2)(vi) regarding prosecution witnesses providing false testimony at trial. 9/13/10 PCRA Op. at 5. The court denied all three claims. As to the <u>Brady</u> claim, the PCRA court first found that Chilcote "incorrectly interpreted" DA Nelson's

statements regarding contact with the parole board.  Id. at 9.  The PCRA court then

resolved the Brady claim with the following internally inconsistent analysis:

> Further, the complete lack of any corroborating evidence
> of *any agreement* in exchange for Kohr's testimony gives
> this court no alternative but to find insufficient evidence to
> hold that any agreement *other than the one acknowledged
> by the Commonwealth* existed between District Attorney
> Nelson and Kohr.  Given the *lack of credible evidence of an
> agreement* there is no need to review the second prong of
> the [Brady] test and this ground for relief is denied.

Id. (emphasis added).

On appeal, the Superior Court affirmed in part and vacated in part.

Commonwealth v. Harshman, No. 1644 MDA 2010, 32 A.3d 848 (Pa. Super. Ct. 2011)

(table).  The Superior Court vacated the PCRA court's order due to Kohr and

Granlun being permitted to blanketly assert Fifth Amendment privileges against

self-incrimination at the evidentiary hearings.  Id. at 9-12.  It instructed the PCRA

court to allow individual questions to be asked of Kohr and Granlun and to

determine—on a question-by-question basis—whether the witnesses could properly

invoke the Fifth Amendment.  Id. at 9-10.  The Superior Court affirmed the

evidentiary holdings of the PCRA court that excluded as hearsay certain evidence

proffered by Harshman in support of his claims regarding false trial testimony.  Id.

at 6-8.

### B.    March 2014 and June 2014 PCRA Opinions and Appeal

On remand, the PCRA court held additional evidentiary hearings on

September 6, 2012, and March 28, 2013.  (Doc. 1 ¶¶ 29, 31).  At the September 6

hearing, Granlun fully recanted his trial testimony, explaining that he had never

spoken to Harshman in prison and that the testimony he had given at Harshman's trial was unequivocally false. (9/6/12 PCRA Hr'g Tr. 26:9-16, 27:10-25, 33:6-7, 37:2-13, 38:4-6).

Granlun averred that he had testified against Harshman in exchange for various types of favorable treatment from the Commonwealth and outlined the nature of those benefits. Granlun explained that another inmate at the prison, Keith Snyder, was distraught because his mother was terminally ill and he was unable to visit her. (Id. at 26:17-27:2). Granlun, through his relationship with DA Nelson based on his agreement to testify, was able to help Keith Snyder secure temporary release and transportation to visit his dying mother. (Id. at 27:2-9). Granlun further testified that, in exchange for his cooperation, he was released from prison approximately two hours after testifying at Harshman's trial and that his pending criminal charges and fines were dismissed. (Id. at 21:24-22:23, 29:14-24, 36:8-13). Harshman's PCRA counsel presented evidence corroborating this testimony, including authenticated prison records confirming Granlun's release on July 12, 2001, the day he testified,[5] (id. at 30:7-25), and an October 10, 2001 order from the Franklin County Court of Common Pleas stating that "it appearing that [Granlun] assisted the Franklin County District Attorneys as a key witness in the prosecution of said case and it is the request of the district attorney's office to have all current charges and sums due dismissed . . . it is ordered that the above-

---

[5] This release date was again verified at the March 28, 2013 PCRA hearing by the central booking administrator of the Franklin County Jail. (3/28/13 PCRA Hr'g Tr. 7:8-8:5).

captioned case be closed and all sums due in the amount of $1,309.20 be remitted," (id. at 24:20-25:4).

Dill testified for a second time at the September 6 hearing. He averred that, prior to trial, Granlun had called and asked him to contact Harshman's trial counsel, Attorney Keller. (Id. at 51:10-16). Dill averred that he had informed Attorney Keller that Granlun, his brother-in-law, was in jail and wanted to speak with Attorney Keller because "there was a bunch of guys going to lie at the trial and [Granlun] wanted [Attorney Keller] to come down to ask him or help him out or whatever." (Id. at 51:17-24). According to Dill, Granlun had explained that "there w[ere] two or three prisoners that got together to testify to get better 'sentences'" and Granlun wanted Attorney Keller to come to the prison to discuss the matter. (Id. at 55:20-56:8). The Commonwealth did not renew its objection to Dill's explanation of why Granlun had asked him to contact Attorney Keller, and the testimony on this subject was admitted and in fact considered by the PCRA court. See Commonwealth v. Harshman, No. CP-28-CR-851-2000, at 14-15 (Pa. Ct. Com. Pl. Franklin Cty. June 10, 2014) [hereinafter "6/10/14 PCRA 1925(a) Op."].

Dill further averred that he had spoken directly with DA Nelson, informing him that Granlun was "wavering on testimony." (9/6/12 PCRA Hr'g Tr. at 52:5-8). Dill explained that, in response, DA Nelson told him that "three or four DUIs would put [Granlun] in prison for a long time" and that Granlun "should just go ahead and do it." (Id. at 52:9-12). On cross-examination, Dill testified that DA Nelson had stated that the Commonwealth "was trying to help my brother-in-law and they were

helping him out in New York and everything else" and that Granlun "needs to get in there and [testify]." (Id. at 55:1-4).

Kohr again refused to testify, and the PCRA court once more permitted him to assert a blanket Fifth Amendment privilege. (Id. at 60:5-62:11). In doing so, the PCRA court stated that it "disagree[d] with the Superior Court's decision in this case" regarding blanket assertion of the Fifth Amendment due to a conflicting Superior Court panel decision. (Id. at 62:1-11).

The PCRA court held its next hearing on March 28, 2013. (Doc. 1 ¶ 31). The Commonwealth presented several witnesses, including Attorney Keller and then-Assistant District Attorney, now-Franklin County Judge, Angela R. Krom ("ADA Krom"). (See generally 3/28/13 PCRA Hr'g Tr.). When asked whether there was any "special deal" or "special treatment" for Granlun in exchange for his trial testimony, ADA Krom replied that, to her knowledge, "the only benefit Mr. Granlun was looking for was for some benefit for his friend [Keith] Snyder." (Id. at 20:8-20). She further verified that Granlun's "fines and costs were discharged," which was not typical. (Id. at 28:11-23). ADA Krom then confirmed that possible reasons for remittal of fines and costs included "financial hardship" as well as "cooperation." (Id. at 29:12-15).

Attorney Keller testified that, according to his notes, he had spoken with Dill prior to Harshman's trial. (Id. at 40:13-41:17). Attorney Keller's notes were read into the record during the hearing. (Id.) They reflected that Dill had relayed to Attorney Keller that Granlun had informed the Commonwealth that he did not

want to testify, that "they're saying I'll [Granlun] go back to jail," and that Granlun was "in the middle of something he has no business in." (Id.)

The PCRA court issued its next opinion on March 10, 2014. Commonwealth v. Harshman, No. CP-28-CR-851-2000 (Pa. Ct. Com. Pl. Franklin Cty. Mar. 10, 2014) [hereinafter "3/10/14 PCRA Op."]. The court addressed two specific issues: (1) after-discovered evidence under 42 PA. CONS. STAT. § 9543(a)(2)(vi) regarding Granlun's recantation testimony, and (2) ineffective assistance of trial counsel. 3/10/14 PCRA Op. at 2. The PCRA court found Granlun's recantation testimony incredible and "inherently untrustworthy." Id. at 3-4. The court ultimately held that, under Pennsylvania Supreme Court after-discovered-evidence jurisprudence, Granlun's recantation testimony did not afford Harshman a basis for relief. Id. at 5 (citing Commonwealth v. Washington, 927 A.2d 586 (Pa. 2007)). In particular, the court found dispositive that the "after-discovered evidence" of Granlun's recantation testimony "would not have compelled a different verdict." Id. at 4.

Harshman appealed the March 10, 2014 PCRA opinion, citing seven alleged errors in his concise statement of matters complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). 6/10/14 PCRA 1925(a) Op. at 6. The issues Harshman raised included that the PCRA court had failed to abide by the Superior Court's August 31, 2011 remand order regarding Kohr's blanket Fifth Amendment assertion, had failed to recognize an undisclosed deal between the Commonwealth and Granlun, and had failed to apply the correct legal standards to the alleged existence of an undisclosed deal with Granlun. Id.

The PCRA court issued a Rule 1925(a) opinion on June 10, 2014, addressing the issues it had not discussed in its March 10, 2014 opinion. As to the <u>Brady</u> claim, the court first reviewed the evidence presented, which included Granlun's full recantation of his trial testimony; Granlun's PCRA testimony regarding immediate release from prison and the dismissal of charges and fines in exchange for testifying at trial; Dill's corroborating PCRA testimony regarding false trial testimony offered by jailhouse informants and his direct conversations with DA Nelson concerning favorable treatment for Granlun; the documentary evidence submitted establishing that Granlun was released the day he testified and had his pending charges and fines dismissed "at the request of the District Attorney's Office" for his cooperation; and ADA Krom's testimony that she did not recall any deal other than "Granlun asking for some benefit for his friend [Keith] Snyder." <u>Id.</u> at 10-13. After considering all the evidence submitted, the court found that "no deal existed between the Commonwealth and Granlun." <u>Id.</u> at 13.

The PCRA court next analyzed, in the alternative, the materiality of the <u>Brady</u> evidence regarding the alleged deal. <u>Id.</u> at 13. The court noted that despite Granlun's recantation, "Kohr's trial testimony of [Harshman's] admission still stands." <u>Id.</u> It reasoned that "there was a plethora of circumstantial evidence upon which a jury was entitled to find guilt," and concluded that even if a deal between Granlun and the Commonwealth had not been disclosed, it would not have satisfied <u>Brady</u>'s materiality standard. <u>Id.</u> The court added that its March 10, 2014 opinion elaborated on this point when it reasoned that "even if Granlun's testimony would

have been consistent with his recanted testimony, a jury still would not have been compelled to find [Harshman] not guilty." Id.

The Superior Court issued its decision on February 25, 2015. Commonwealth v. Harshman, No. 623 MDA 2014, 2015 WL 6172671 (Pa. Super. Ct. Feb. 25, 2015) (nonprecedential). In reviewing the Brady claim, the Superior Court first noted the unreliability of recantation testimony, then adopted wholesale the PCRA court's analysis, concluding that "the record supports the [PCRA] court's determination that there was no undisclosed deal." Id. at *4-5. The court then performed a Brady materiality analysis in the alternative. Id. at *5. It began by stating, "even if a deal existed and it was material, [Harshman] fails to prove how it would have changed the outcome of [his] trial." Id. Observing that the prosecution can sustain its burden of proof at trial by circumstantial evidence alone, the court reasoned that "the jury could have found [Harshman] guilty based on Mr. Kohr's testimony and the plethora of circumstantial evidence." Id. However, the court remanded on the issue of Kohr's blanket assertion of the Fifth Amendment and the PCRA court's direct refusal to comply with the earlier remand order, reassigning the case to a different judge. Id. at *3-4, 8; (Doc. 1 ¶ 36).

### C. August 2015 PCRA Opinion and Appeal

A sixth and final evidentiary hearing was held on May 21, 2015. (Doc. 1 ¶ 36). Harshman presented two witnesses: Kohr and Chilcote. (See generally 5/21/15 PCRA Hr'g Tr.). During this proceeding, Kohr was asked specific questions and was permitted to discuss with his appointed counsel whether to invoke the Fifth Amendment on a question-by-question basis. (See generally id. at 11:17-65:10). Of

relevance to the matter *sub judice*, Kohr testified that he had asked DA Nelson about writing to the parole board on his behalf and that DA Nelson had agreed to do so. (Id. at 26:16-27:13). Kohr further attested that he had expected "to get some help" from the Commonwealth in obtaining an early release from prison, possibly before the birth of his daughter in November 2000, but clarified that his trial "testimony had nothing to do with making a deal or anything to get out or cooperation." (Id. at 33:14-36:19). Kohr also affirmed his prior trial testimony that Harshman had admitted to murdering Snyder. (Id. at 24:19-25:15).

In a written opinion dated August 20, 2015, the PCRA court examined one issue: "did [Harshman] provide enough evidence in his PCRA that an agreement existed that was not disclosed to [him] and that enticed witness testimony." 8/20/15 PCRA Op. at 6. The court considered the letters written by DA Nelson to the parole board as well as Kohr's testimony from the May 2015 hearing where he admitted to seeking and expecting assistance from DA Nelson regarding his parole status. Id. at 8-12. The court reasoned that while Harshman claimed that DA Nelson had "failed to disclose the presence of an agreement relating to assisting Mr. Kohr with the state parole board, the record establishes that such an agreement was clearly disclosed." Id. at 10. The court concluded that Harshman had failed to show "that a deal existed or that his trial counsel was unaware of a certain deal." Id. at 12.

The court then performed a Brady materiality analysis in the alternative. It found that, even if the testimony of Granlun and Kohr had been excluded, there was other "overwhelming evidence" of Harshman's guilt, reasoning that "[t]his was not a case where the jury's finding of guilt was contingent on the testimony of Mr.

Kohr and Mr. Granlun being credible," and that even if a deal existed "it would not be essential to the verdict." Id.

On appeal, the Superior Court affirmed the PCRA court's determination that "there was 'no undisclosed deal between Mr. Kohr and the Commonwealth.'" Harshman, 2016 WL 3135797, at *6 (quoting 8/20/15 PCRA Op. at 13). The Superior Court acknowledged the letters written to the parole board by DA Nelson on Kohr's behalf, then affirmed the PCRA court's determination that there was no deal. Id. at *6. The court reasoned that "no deal" existed between Kohr and the prosecution because the letters were written prior to trial, they had "no effect" because parole was not granted, and Kohr had testified at trial despite knowing of the inefficacy of the letters. Id. The Superior Court did not discuss the PCRA court's Brady materiality analysis, nor did it independently perform one. See generally id. at *5-8.

### D. Federal Habeas Proceedings

After exhausting post-conviction review in state court, (see Doc. 1 ¶ 40), Harshman filed the instant Section 2254 petition. Magistrate Judge Karoline Mehalchick has issued a report recommending that the petition be granted, finding meritorious Harshman's first ground for relief asserting Brady violations by the Commonwealth. Both parties have objected in part to Judge Mehalchick's report and recommendation, triggering de novo review thereof. The Section 2254 petition is now ripe for disposition.

## III. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. §§ 2241–2254, mandates that petitioners demonstrate that they have

"exhausted the remedies available in the courts of the State" before seeking federal habeas relief. 28 U.S.C. § 2254(b)(1)(A). An exhausted claim is one that has been "fairly presented" to the state courts "by invoking one complete round of the State's established appellate review process," and which has been adjudicated on the merits. Carpenter v. Vaughn, 296 F.3d 138, 146 (3d Cir. 2002) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999)); see also Johnson v. Williams, 568 U.S. 289, 302 (2013).

When a claim is properly exhausted and then raised on federal habeas review, the level of deference afforded to the state court decision is substantial. Bey v. Superintendent Greene SCI, 856 F.3d 230, 236 (3d Cir. 2017), cert. denied sub nom., Gilmore v. Bey, 138 S. Ct. 740 (2018) (mem.). The AEDPA "does not 'permit federal judges to . . . casually second-guess the decisions of their state-court colleagues or defense attorneys.'" Collins, 742 F.3d at 543 (quoting Burt v. Titlow, 571 U.S. 12, 15 (2013)). Accordingly, under Section 2254(d), federal habeas relief is unavailable for exhausted claims unless the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). An "unreasonable application" of Supreme Court precedent includes situations where "the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case." White v. Woodall, 572 U.S. 415, 425 (2014) (quoting Williams v. Taylor, 529 U.S. 362, 407 (2000)).

This is an intentionally difficult standard to meet.  Harrington v. Richter, 562 U.S. 86, 102 (2011).  Section 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" clearly established Supreme Court precedent.  Id. Therefore, to obtain federal habeas relief on an exhausted claim, a state prisoner must demonstrate that the state court's ruling on the claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Id. at 103.

Finally, if a state court has ruled on the merits of a claim, a federal habeas petitioner generally must meet Section 2254(d)'s requirements "on the record that was before that state court."  Cullen v. Pinholster, 563 U.S. 170, 185 (2011) (footnote omitted).  Absent compelling circumstances, see 28 U.S.C. § 2254(e)(2), district courts cannot supplement the existing state-court record for claims adjudicated on the merits.  Brown v. Wenerowicz, 663 F.3d 619, 629 (3d Cir. 2011).  "Otherwise, federal habeas petitioners would be able to circumvent the finality of state court judgments by establishing a new factual record" on federal habeas review.  Id.

IV.    **Discussion**

In examining Harshman's Brady claim, Judge Mehalchick concentrates on the letters written by DA Nelson to the parole board on Kohr's behalf.  Judge Mehalchick finds that those letters were unquestionably "favorable to the accused" and therefore focuses her analysis on whether the evidence had been suppressed and whether it was material.  Concluding that the evidence was both suppressed

and material, Judge Mehalchick recommends that Harshman's Section 2254 petition be granted.

We have thoroughly reviewed the state-court record and opinions in this matter. We agree with Judge Mehalchick's analysis as to the letters and with her recommended outcome, but we will grant the writ for additional reasons. We find that Harshman properly identifies <u>Brady</u> violations as to both Kohr *and* Granlun.[6] We conclude that the state court's denial of Harshman's <u>Brady</u> claim rests on unreasonable applications of settled Supreme Court precedent.

### A.    Supreme Court Jurisprudence Regarding Disclosure of Evidence

Under <u>Brady v. Maryland</u>, the government must disclose to a criminal defendant any evidence in its possession that is favorable to the defendant and material to guilt or punishment. <u>Brady</u>, 373 U.S. at 87. Failure to do so violates a defendant's due process rights under the Fifth Amendment to the United States Constitution. <u>Id.</u> at 86, 87. Both impeachment evidence and exculpatory evidence implicate the government's disclosure duty. <u>See</u> <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).

---

[6] Harshman properly exhausted and preserved his claim of <u>Brady</u> violations regarding Kohr and Granlun. Although the instant petition focuses on Kohr, Harshman repeatedly identifies <u>Brady</u> violations with respect to Granlun. (<u>See</u> Doc. 1 ¶¶ 15, 22, 27, 29, 32, 33, 79). In his issue statement for ground one, Harshman asserts <u>Brady</u> violations based on "undisclosed prosecutorial *deals* with jailhouse *informants*." (<u>Id.</u> ¶¶ 44-45 (emphasis added); <u>see also</u> <u>id.</u> ¶ 79 (claiming state-court determinations "that the Commonwealth did not fail to disclose any '*deals*' with its *three jailhouse snitches* were manifestly unreasonable" (emphasis added))). Moreover, respondents admit that Harshman properly exhausted his state-court remedies as to the claims raised in his Section 2254 petition. (<u>See</u> Doc. 1 ¶ 40; Doc. 9 ¶ 40).

A <u>Brady</u> violation occurs when "(1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment." <u>Simmons v. Beard</u>, 590 F.3d 223, 233 (3d Cir. 2009) (quoting <u>United States v. Risha</u>, 445 F.3d 298, 303 (3d Cir. 2006)).  Evidence is "material" if there is a reasonable probability that, but for the prosecution's failure to disclose the evidence, "the result of the proceeding would have been different." <u>Kyles v. Whitley</u>, 514 U.S. 419, 433-34 (1995) (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)).  A defendant can demonstrate a "reasonable probability" of a different result if the government's suppression of evidence "undermines confidence in the outcome of the trial." <u>Id.</u> (quoting <u>Bagley</u>, 473 U.S. at 678).  By contrast, the mere possibility of a more favorable result for the defendant is insufficient to establish materiality.  <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 291 (1999).

**B.     State Courts' Unreasonable Application of <u>Brady</u> – No "Deal"**

Harshman's <u>Brady</u> claim has been repeatedly stymied throughout his post-conviction proceedings by the state courts' determinations that "no deal" existed between Granlun or Kohr and the Commonwealth for favorable treatment in return for trial testimony.  In every opinion issued on this topic, the courts' singular focus involved determining if a formal "deal" existed that had not been disclosed by the Commonwealth.  <u>See</u> <u>generally</u> Section II, *supra*.  This myopic analysis is an unreasonable application of <u>Brady</u> and its progeny.

Certainly, <u>Brady</u> is violated when the government fails to turn over evidence of an actual agreement between the prosecution and one of its witnesses regarding favorable treatment in exchange for testimony.  <u>See</u> <u>Giglio</u>, 405 U.S. at 151-54.  But

Brady evidence is not limited to actual "deals" or "agreements" between witnesses and the government. Under firmly established Supreme Court precedent including, *inter alia*, Brady, Giglio, Strickler, Bagley, and Kyles, the prosecution must turn over evidence that is "favorable to the accused." In the context of a government witness, this could mean impeachment evidence regarding favorable treatment or even the possibility or expectation of favorable treatment, see Giglio, 405 U.S. at 151-54; evidence that impugns the reliability of the witness's testimony, see Kyles, 514 U.S. at 441-45; and evidence of bias, prejudice, or ulterior motives affecting the witness's credibility, cf. Davis v. Alaska, 415 U.S. 308, 316 (1974). Against this settled legal landscape, the Brady violations in this case are obvious.

### 1.      ***Brady*** *Violation Regarding Kohr*

We first examine the evidence as to Kohr. DA Nelson admitted that he sent not one but two letters to the parole board on Kohr's behalf. To the extent the PCRA court found that the agreement to assist Kohr with the parole board was "clearly disclosed," see 8/20/15 PCRA Op. at 10, that finding is rebutted by clear and convincing evidence, see 28 U.S.C. § 2254(e)(1). The record establishes, and respondents admit, that existence of the letters was not disclosed until the PCRA proceedings. (See 8/3/09 PCRA Hr'g Tr. 69:19-72:8; Doc. 10 at 2). The PCRA court appears to have mistaken post-conviction disclosure with Brady disclosure. Quite logically, however, Brady requires disclosure *prior to trial*, not in collateral relief proceedings. See Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 298 (3d Cir. 2016) (*en banc*).

We are also unconvinced by respondents' assertions that even if the letters themselves were not turned over, the fact of assistance was timely revealed. (See Doc. 16 at 11-13, 20-21). Respondents cite no portion of the record indicating that the Commonwealth disclosed the parole-board assistance before or during trial. They argue that Kohr's trial testimony that he "maxed out" and that "[n]obody in Franklin County can do anything with state parole" shows that the assistance was disclosed. (See id. at 12 (citing 7/12/01 Trial Tr. 21:18-21, 30:3-7)). This testimony, *per contra*, in no way establishes disclosure of the prosecution's assistance; it merely reiterates Kohr's untenable suggestion at trial that he received no favorable treatment from the Commonwealth.

The substance of those undisclosed letters bears repeating verbatim. On November 28, 2000, DA Nelson wrote, in pertinent part,

> While incarcerated at the Franklin County Prison, Mr. Kohr became privy to information concerning a pending murder prosecution in Franklin County. . . . The information Mr. Kohr has provided *may be critical to the successful prosecution of this murder case.* He has agreed to testify and has also provided the identity of another inmate who corroborates the information he has provided.
>
> *As the result of his cooperation with the Commonwealth,* I have advised Mr. Kohr that I would contact the Parole Board to request that he be granted an early review and that the Board *take into consideration his cooperation* and perhaps grant him an earlier release date.

(Doc. 1-5 at 1 (emphasis added)). On January 19, 2001, DA Nelson followed up:

> Perhaps you will recall that I wrote to you a letter dated November 28th, 2000 concerning the above referenced individual and *cooperation that he had provided to the Commonwealth in a very important homicide investigation.* Since that time, it is my understanding that assault charges

which had been pending against Mr. Kohr in Fulton County, Pennsylvania have been dismissed. I was curious whether you could advise me when Mr. Kohr's case would once again be reviewed by the Parole Board *as I had assured him in exchange for his cooperation that I would ask the Board to take that cooperation into consideration* in determining what [the] Board action would be.

(Doc. 1-6 (emphasis added)).

The impeachment value of this evidence is self-evident, and the state courts' failure to acknowledge this overt <u>Brady</u> violation was an unreasonable application of clearly established federal law. The post-hoc PCRA assertions of Kohr and DA Nelson that these letters were not part of any "agreement" in exchange for trial testimony is both rebutted by the letters' explicit language and irrelevant in determining whether a <u>Brady</u> violation occurred. The fact that Kohr still testified even though DA Nelson was unable to procure his release prior to Harshman's trial is likewise immaterial. <u>Brady</u> evidence is that which is favorable to the accused, including impeachment evidence. These letters unambiguously indicate that the District Attorney of Franklin County—who was leading Harshman's prosecution—agreed to contact the parole board on Kohr's behalf "in exchange for [Kohr's] cooperation." (<u>Id.</u>) They are unquestionably favorable to Harshman and were required to be disclosed pursuant to <u>Brady</u>.

We reject respondents' inverted argument that Harshman "failed to meet his burden of proving that these letters to the State Parole Board were *not* disclosed by the Commonwealth." (Doc. 10 at 4 (emphasis added); <u>see</u> <u>also</u> Doc. 16 at 18-19). We discern no such burden in this case. The Commonwealth has never claimed that it disclosed these letters prior to trial, and <u>Brady</u> requires the government to disclose

24

favorable evidence in its possession even without a specific request. Strickler, 527 U.S. at 280 (citing United States v. Agurs, 427 U.S. 97, 107 (1976)). Respondents essentially demand that Harshman prove a negative to advance his claim, an evidentiary task which both the Pennsylvania Supreme Court and the Third Circuit have recognized is "virtually impossible." See Commonwealth v. DeHart, 516 A.2d 656, 668 (Pa. 1986); Lupyan v. Corinthian Colls. Inc., 761 F.3d 314, 322 (3d Cir. 2014).

We likewise reject respondents' argument regarding the absence of a "*quid pro quo*" arrangement. (See Doc. 16 at 7-11). As explained above, Brady is not so constrained. "[E]ven if there is no evidence of any *quid pro quo*" between the witness and the government, "it is the fact that [the witness] had a strong reason to lie, and to testify in a manner that would help the prosecutor . . . that establishes the potential bias that would have been extremely compelling impeachment evidence." Grant v. Lockett, 709 F.3d 224, 236 (3d Cir. 2013).

## 2. *Brady* Violation Regarding Granlun

The Commonwealth also clearly violated Brady in relation to Granlun. We initially note that extensive evidence was presented in the PCRA proceedings regarding favorable treatment for Granlun concerning his own pending criminal liability and related fines and costs. Granlun—despite threat of prosecution for perjury—unequivocally averred at the September 6, 2012 PCRA hearing that he had testified falsely at trial and did so in exchange for favorable treatment from the prosecution, including dismissal of his pending criminal and financial liabilities.

But there was other independent, corroborating evidence beyond Granlun's own PCRA testimony. For example, it is undisputed that Granlun was released

from prison the very day he testified against Harshman. Nowhere in the record does the Commonwealth provide an explanation for why Granlun secured release from prison approximately two hours after testifying at Harshman's trial.

Additional corroboration comes from both documentary and testimonial evidence. The Commonwealth does not dispute that Granlun's pending fines and costs of approximately $1,300 were remitted. Granlun testified that this remittal was due to his agreement to testify against Harshman. Although acknowledging that fines and costs could be remitted for multiple reasons, including "cooperation," (3/28/13 PCRA Hr'g Tr. 29:12-15), the government never explained this particular remittal. The only non-testimonial explanation came by way of the effectuating October 2001 order, which recognized Granlun's assistance in acting as a "key witness" for the prosecution before dismissing all charges and sums due at the "*request of the district attorney's office*." (9/6/12 PCRA Hr'g Tr. 24:20-25:4 (emphasis added)). Granlun's brother-in-law, Dill, separately confirmed the cooperation, testifying that he had spoken to DA Nelson directly, knew that DA Nelson was trying to help Granlun, and believed DA Nelson applied pressure regarding Granlun's current legal troubles when he learned that Granlun was wavering on his decision to testify.

Despite all this evidence, the PCRA court found no <u>Brady</u> violation, concluding that the Commonwealth had provided no favorable treatment to Granlun regarding his personal criminal and financial liabilities in exchange for testimony. The court categorically rejected Granlun's recantation as incredible; dismissed the October 2001 order because it postdated Granlun's testimony and

was not "filed until after the expiration of Granlun's parole"; and completely discounted Dill's testimony because it was "based on information that he received from his admittedly untrustworthy brother-in-law Granlun." 6/10/14 PCRA 1925(a) Op. at 10-13. The court never addressed Dill's testimony about his conversations with DA Nelson concerning assistance for Granlun's pending criminal troubles, nor did it discuss the fact that neither Granlun nor Dill appeared to have any reason to testify untruthfully at the PCRA hearings. Granlun, in fact, fully recanted his trial testimony despite believing he faced imminent prosecution for perjury. On appeal, the Superior Court essentially adopted the PCRA court's rationale and findings on this issue.

We disagree with the state courts' factual determination and would have held differently. Harshman presented the PCRA court with substantial evidence that the Commonwealth had provided Granlun favorable treatment concerning his own criminal and financial liabilities. Nevertheless, under the considerable deference required by Section 2254(d), even though we believe the PCRA court's findings were incorrect, we cannot say its decision was based on an *unreasonable*

determination of the facts.  See 28 U.S.C. § 2254(d)(2); Dennis, 834 F.3d at 281

(citations omitted).[7]

But the Brady evidence relating to Granlun does not end there.  The record

unquestionably demonstrates that the Commonwealth provided benefits to Granlun

through preferential treatment for his prison acquaintance, Keith Snyder ("Keith").

At the August 3, 2009 PCRA hearing, Harshman attempted to present Keith as a

witness.  (8/3/09 PCRA Hr'g Tr. 77:9, 78:24-25).  Harshman's PCRA counsel

proffered that Keith would testify that, through his friendship with Granlun, Keith

had learned that Granlun's trial testimony was false.  (Id. at 79:4-9).  Keith would

also aver that he had received a special privilege by temporarily getting out of

prison to see his dying mother, which the Commonwealth had facilitated without

court order.  (Id. at 79:9-15).  Harshman also identified a letter Keith wrote to DA

Nelson verifying the temporary release.  (Id. at 79:15-21).

---

[7] We further note that Harshman has moved to supplement the record with newly discovered evidence.  (Doc. 17).  According to his affidavit, former Franklin County Deputy Sheriff Jason Bitner ("Bitner") recently came forward with additional evidence of promises of favorable treatment made to the jailhouse witnesses by the Commonwealth.  Bitner avers that he transported three prisoners to the sheriff's office around the time of Harshman's murder trial.  (Doc. 17-1 ¶ 5).  Each prisoner was interviewed separately by DA Nelson, and Bitner was present for "substantial parts" of the interviews.  (Id. ¶¶ 6-7).  Bitner specifically recalls DA Nelson indicating to the prisoners that "if they testified as expected, in a manner favorable to the Commonwealth, that the District Attorney would help them obtain earlier release from prison."  (Id. ¶ 8).  Bitner was also present for some of these witnesses' testimony during Harshman's trial, and "was struck by, and troubled by, their testimony to the effect that no promises for any help were made to them by the District Attorney in return for their testimony."  (Id. ¶ 9).  Bitner's affidavit, if true, is indeed troubling.  However, because we find the record before the state court unequivocally demonstrates material Brady violations, we need not supplement the record pursuant to 28 U.S.C. § 2254(e)(2)(A)(ii).

DA Nelson fully admitted to providing special treatment to Keith at the behest of Granlun. (Id. at 80:12-25). DA Nelson confirmed that the Commonwealth both "wrote a letter to the parole board" on Keith's behalf and transported Keith from jail to the hospital to see his "gravely ill" mother. (Id. at 80:18-24). DA Nelson explained, "We don't deny that it happened. It did happen. . . . We think Darren Hockenberry and Mark Chris[t]man took [him]. . . . We know it happened. [They] took [Keith] to see his mother who he thought was terminally ill, whatever." (Id. at 80:23-81:5). Granlun corroborated this testimony at a later PCRA hearing, (9/6/12 PCRA Hr'g Tr. 26:17-27:9), and ADA Krom testified that she recalled that Granlun had sought "some benefit for his friend [Keith]," (3/28/13 PCRA Hr'g Tr. 20:12-17). When Harshman's PCRA counsel pointed out that the prosecution had only disclosed the letter to the parole board on Keith's behalf and not the special hospital visit, DA Nelson conceded, "You're right about that." (8/3/09 PCRA Hr'g Tr. 81:10-19; see also id. at 82:5-11).

The state courts' only reference to favorable treatment provided to Keith on Granlun's behalf appears in the June 2014 PCRA opinion. The court found that "it is undisputed that this request [from Granlun for some benefit for Keith] was disclosed to trial counsel by letter dated June 19, 2001 from the District Attorney's Office." 6/10/14 PCRA 1925(a) Op. at 12. This finding is rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1). DA Nelson admitted that the prosecution had *only* disclosed the letter to the parole board on Keith's behalf, *not* the temporary release and transportation of Keith from jail to see his terminally ill mother. (See 8/3/09 PCRA Hr'g Tr. 81:10-19; see also id. at 82:5-11).

Once again, we find the <u>Brady</u> violation apparent on its face. The undisputed facts establish that the Commonwealth—on request from a key cooperating witness—secured temporary release and transportation for an inmate to see his dying mother in the hospital. This type of preferential treatment is, without a doubt, compelling impeachment material that must be disclosed to the defendant prior to trial. Assuming *arguendo* that Granlun received no direct personal benefit for his testimony, the state courts' determination that there was no <u>Brady</u> violation relative to Granlun was still an unreasonable application of <u>Brady</u> and <u>Giglio</u>.

### C. State Courts' Unreasonable Application of <u>Brady</u> – No Prejudice

Even though the state courts repeatedly found no <u>Brady</u> violations, they performed materiality analyses in the alternative. Such determinations, if reasonable, could absolve the unreasonable conclusions that no <u>Brady</u> violations occurred. Unfortunately, the state courts' applications of precedent regarding materiality were also plainly unreasonable. First, the courts never performed the proper cumulative assessment of prejudice as required by <u>Kyles</u>. Second, in its materiality analysis in relation to Granlun, the Superior Court applied the wrong standard. We will address these issues in reverse order for the sake of clarity.

#### 1. *Wrong Standard*

In its February 25, 2015 opinion, the Superior Court adopted the PCRA court's rationale and conclusion on the absence of a <u>Brady</u> violation as to Granlun. <u>Harshman</u>, 2015 WL 6172671, at *4-5. It then proceeded to a materiality analysis, stating, "even if a deal existed and it was material, [Harshman] *fails to prove how it would have changed the outcome of [his] trial.*" <u>Id.</u> at *5 (emphasis added). Next,

noting that the prosecution can sustain its burden of proof by circumstantial evidence alone, the Superior Court reasoned that "the jury *could have found [Harshman] guilty* based on Mr. Kohr's testimony and the plethora of circumstantial evidence." Id. (emphasis added). The court closed by setting forth the remaining evidence presented at trial with Granlun's testimony omitted, concluding that "the record supports the PCRA court's denial of relief" on the Brady claim. Id.

This analysis was plainly incorrect. Harshman is not required to prove that the suppressed Brady evidence "would have changed the outcome" of his trial because a defendant does not have to show that the evidence would have resulted in acquittal. Kyles, 514 U.S. at 434. The applicable standard, as the Supreme Court has repeatedly held, is that the defendant must demonstrate "a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 433-34 (citation omitted) (emphasis added).

The Superior Court also improperly performed a sufficiency-of-the-evidence analysis, finding that, due to other circumstantial evidence presented at trial, the jury "could have found" Harshman guilty even without Granlun's testimony. This too was error. Materiality under Brady "is not a sufficiency of the evidence test." Kyles, 514 U.S. at 434-35; Dennis, 834 F.3d at 295 (citing Kyles, 514 U.S. at 435); Goudy v. Basinger, 604 F.3d 394, 400 (7th Cir. 2010). Thus, while the Superior Court arguably identified the appropriate materiality test under Brady, see Harshman, 2015 WL 6172671, at *4 (citations omitted), it unreasonably applied that standard to the facts of the case. See White, 572 U.S. at 425 (quoting Williams, 529 U.S. at 407).

## 2. *Failure to Assess Cumulative Effect of Suppressed Evidence*

The Superior Court's decision is flawed for another, more fundamental reason. Regardless of the standard applied, its 2015 decision could not have resulted in a reasonable application of Brady and its progeny because it failed to assess the cumulative effect of the suppressed evidence. This failure was most likely a byproduct of the nearly six-year appeal and remand process, which resulted in multiple piecemeal PCRA court decisions and various partial affirmances and remands by the Superior Court. But it was a failure nonetheless.

The Supreme Court has long held that Brady evidence must be "considered collectively, not item by item." Kyles, 514 U.S. at 436 & n.10; Dennis, 834 F.3d at 312. Examining the materiality of suppressed Brady evidence piece by piece is improper because, while each item may not be "material" on its own, when aggregated it may undermine confidence in the trial's outcome. Johnson v. Folino, 705 F.3d 117, 129 (3d Cir. 2013) (quoting Bagley, 473 U.S. at 678). Cumulative assessment matters "because the sum of the parts almost invariably will be greater than any individual part." Id. at 131 (quoting Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1347 (11th Cir. 2009)). As the Third Circuit has admonished, "[t]he importance of cumulative prejudice *cannot be overstated*, as it stems from the inherent power held by the prosecution, which motivated Brady." Dennis, 834 F.3d at 312 (emphasis added).

It does not appear that any state appellate court performed a cumulative assessment when determining materiality. The closest the state courts came to correctly applying Kyles appears in the August 20, 2015 PCRA opinion. There, in a

single paragraph discussing materiality in the alternative, the PCRA court mentions both Kohr and Granlun. 8/20/15 PCRA Op. at 12. It is debatable whether the PCRA court actually performed a cumulative assessment—its determination of whether Brady evidence was suppressed and its ultimate conclusion on materiality reference only Kohr. See id. at 7-13. But even if it had, an underlying defect with the PCRA court's materiality analysis is that it never acknowledged or considered the Brady evidence of the Commonwealth's special treatment regarding Keith's temporary release and transportation to the hospital to see his dying mother. If the state court never considered this evidence in the first place, no Section 2254(d) deference is owed to its materiality analysis even if that analysis was cumulative. See Simmons, 590 F.3d at 233; Smith, 572 F.3d at 1348. As the Eleventh Circuit has explained, a state court cannot "reasonably decide" the materiality issue if it failed to even acknowledge some of the Brady evidence and therefore "did not decide this issue at all." Smith, 572 F.3d at 1348.

### D. Cumulative Materiality Assessment

For all the above-mentioned reasons, the state courts' determination of Harshman's Brady claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. The courts failed to recognize clear Brady violations, failed to apply the correct materiality standard, and failed to perform the required cumulative prejudice assessment. Because Harshman has demonstrated an unreasonable application of clearly established federal law, we must engage in a cumulative materiality analysis. See Panetti v. Quarterman, 551

U.S. 930, 948, 953 (2007); Johnson v. Williams, 568 U.S. 289, 303 (2013) (citing Panetti, 551 U.S. at 953); Dennis, 834 F.3d at 311-12; Smith, 572 F.3d at 1348-49.

It is apparent from the foregoing discussion that Brady evidence existed and that the Commonwealth suppressed it. We must determine whether the cumulative effect of these Brady violations was material, *i.e.*, whether, in the absence of the Brady evidence, Harshman "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434. We find that Harshman did not receive such a trial.

The testimony at trial amply demonstrated a motive for Harshman to kill Snyder due to Snyder's affair with Teresa. There was evidence of a previous violent engagement between Harshman and Snyder where Harshman intentionally crashed into Snyder's vehicle and fired two bullets into the seat beside Snyder. Harshman had also made repeated threats against Snyder to Snyder's wife and son in 1984 and 1985. Neighbors testified that, on the day Snyder went missing, they saw a two-tone brown pickup truck parked next to Snyder's barn and later saw the same truck, which Harshman had purchased in 1984, at Harshman's residence. The sole physical evidence tying Harshman to the murder was a .25 caliber shell casing found in Snyder's barn and a second .25 caliber casing—fired from the same gun—found some 14 years later on property previously owned by the Harshmans. Snyder did not own a .25 caliber gun but Harshman did; he purchased a .25 caliber handgun several days after Teresa served him with divorce papers. And Harshman was not able to produce the gun that he had purchased when requested by the police.

This evidence, while not insubstantial, is far from overwhelming. Police never found a body, blood, DNA evidence, or the purported murder weapon. There were no eyewitnesses. And the only physical evidence connecting Harshman to the murder was the two shell casings found in separate locations and many years apart.

At trial, the Commonwealth bolstered its largely circumstantial case by presenting a trio of jailhouse witnesses who claimed to have spoken to Harshman in prison. Jones' testimony was the least inculpatory. See *supra* at pp. 4-5. But the other two witnesses—Granlun and Kohr—gave damning testimony that, for all practical purposes, constituted confessions by Harshman to the murder. Id. Indeed, both Granlun and Kohr essentially testified that, while incarcerated with them, Harshman admitted to murdering someone who had an affair with his wife and disposing of the body. It is difficult to understate the significance of such devastating testimony and the potential effect it may have had on the jury.

Granlun and Kohr, moreover, averred that they had no self-interest in testifying against Harshman. Kohr attested that he had reluctantly taken the stand, explaining that "I feel that there's some things people can do. I'm not saying that, you know, I was righteous my whole life, I shouldn't have got in trouble for what I did, *but certain things people should pay for what they did, what the cost is*." (7/12/01 Trial Tr. 28:1-14 (emphasis added)). When cross-examined about whether he was receiving anything in return for his testimony, Kohr emphatically denied that was the case and affirmed that he was testifying pursuant to his "duties as a citizen." (Id. at 29:21-30:7). Granlun likewise attested that he personally was not benefitting

from his testimony but admitted that he wanted to help an inmate friend and that is why he had come forward with information about Harshman.  (Id. at 49:3-50:13).

The materiality of evidence "is best understood by taking the word of the prosecutor."  Kyles, 514 U.S. at 444.  DA Nelson, on multiple occasions, emphasized the importance of the jailhouse witnesses' testimony and motives.  In his closing argument, DA Nelson reminded the jury that defense counsel had suggested that the jailhouse witnesses were testifying "because they wanted something in return or they were getting something in return."  (7/13/01 Trial Tr. 62:24-63:2).  He then attempted to undercut that assertion by outlining the witnesses' testimony, reviewing their proffered motives, and arguing that their cooperation was freely offered without any type of benefit given or expected in return.  (Id. at 62:21-66:5). DA Nelson summarized: "This isn't a case where the Commonwealth offered deals to people.  It's a case where people told us information that they had.  And, you know, they all had different reasons for why they were telling."  (Id. at 63:8-11).

Additionally, in his letter to the parole board on Kohr's behalf, DA Nelson described Kohr's testimony as potentially "critical to the successful prosecution of this murder case."  (Doc. 1-5 at 1).  And, according to the October 2001 court order, the district attorney had requested that Granlun's charges and fines be dismissed because Granlun had likewise acted as a "key witness" in Harshman's prosecution. (See 9/6/12 PCRA Hr'g Tr. 24:20-25:4).

The law is clear about the value of impeachment evidence when testimony is critical to the prosecution.  Impeachment evidence, if disclosed and utilized effectively, "may make the difference between conviction and acquittal."  Bagley,

473 U.S. at 676 (citing <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959)).  Indeed, "[t]he

jury's estimate of the truthfulness or reliability of a given witness may well be

determinative of guilt or innocence, and it is upon such subtle factors as the

possible interest of the witness in testifying falsely that a defendant's life or liberty

may depend."  <u>Napue</u>, 360 U.S. at 269.  The Third Circuit has similarly noted that

<u>Brady</u> evidence may be material if it would "seriously undermine the testimony of a

key witness" on an important issue or if the testimony "lacks strong corroboration."

<u>Folino</u>, 705 F.3d at 129.  In fact, almost all the cases decided by the Supreme Court

"since <u>Brady</u> have dealt with impeachment evidence."  <u>Dennis</u>, 834 F.3d at 308

(collecting cases).  This court, moreover, has admonished that "when a witness has

motivation to lie and to offer testimony favorable to the prosecution in exchange for

favorable treatment, that fact 'establishes the potential bias that would [constitute]

compelling impeachment evidence' because such information would benefit a jury

in assessing the witness's reliability."  <u>Moore v. Beard</u>, 42 F. Supp. 3d 624, 638 (M.D.

Pa. 2014) (Conner, C.J.) (alteration in original) (quoting <u>Grant</u>, 709 F.3d at 236)),

aff'd <u>sub nom.</u>, 640 F. App'x 159 (3d Cir. 2016) (nonprecedential).

Impeaching the motives of the instant jailhouse witnesses was crucial to

challenging their credibility.  <u>See</u>, <u>e.g.</u>, <u>Wearry v. Cain</u>, 577 U.S. __, 136 S. Ct. 1002,

1006-07 (2016) (<u>per curiam</u>); <u>Napue</u>, 360 U.S. at 270; <u>Dennis</u>, 834 F.3d at 286-87;

<u>Wilson v. Beard</u>, 589 F.3d 651, 665-67 (3d Cir. 2009); <u>Moore</u>, 42 F. Supp. 3d at 638.

Without the suppressed evidence, Harshman's trial counsel was unable to

effectively cross-examine Kohr and Granlun regarding bias or favorable treatment.

The jury thus heard uncontradicted testimony from two Commonwealth witnesses

who claimed that Harshman had admitted to the murder, and who further testified that they personally had nothing to gain from taking the witness stand.  This damaging testimony was bolstered by the prosecutor during his closing argument. Under such circumstances, we find that there is a reasonable probability that, had the potent impeachment evidence been disclosed to the defendant prior to trial, the result of the proceeding would have been different.  Because Harshman has satisfied all three <u>Brady</u> requirements, <u>see</u> <u>Simmons</u>, 590 F.3d at 233 (citation omitted), we are compelled to grant his Section 2254 petition.[8]

---

[8] We need not reach Harshman's remaining grounds for Section 2254 relief because we find his <u>Brady</u> claim meritorious.

## V.    Conclusion

Brady v. Maryland, 373 U.S. 83 (1963), ensures that a criminal defendant receives—prior to trial—critical impeachment evidence in the government's possession.  In this case, the Commonwealth's failure to comply with the dictates of Brady deprived Ronald Harshman of an opportunity to challenge the motives and veracity of jailhouse witnesses, whose testimony was critical to Mr. Harshman's conviction for first-degree murder.  By failing to disclose material Brady evidence in its possession, the Commonwealth violated Mr. Harshman's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution. Accordingly, we are compelled to conditionally grant defendant's Section 2254 petition, vacate his Pennsylvania murder conviction, and direct the Commonwealth to retry him within ninety days or to provide for his release.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    March 26, 2019